FRITHIOF T. CHRISTENSEN AND RISE N. CHRISTENSEN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71719. Filed December 11, 1959.

*Alex Leslie Janes, Jr., Esq.*, for the petitioners.
*James Booher, Esq.*, for the respondent.

OPINION.

FISHER, *Judge:* Respondent determined a deficiency in income tax against petitioners for the taxable year 1953 in the amount of $1,324.09.

The sole issue presented for determination herein is whether petitioners received a taxable dividend when a corporation canceled the indebtedness of a former shareholder and assigned the proceeds of a life insurance policy to a former shareholder.

All of the facts are stipulated and, together with exhibits, are incorporated herein by reference.

Petitioners filed a timely joint Federal income tax return for the year 1953 with the district director of internal revenue for the district of Minnesota. The tax liability disclosed on such return has been paid.

The American Rug Laundry, Inc., hereinafter called the corporation, is a Minnesota corporation engaged in the business of cleaning rugs, draperies, upholstery, and similar items. The corporation's business operations are conducted at its plant located at Minneapolis, Minnesota, and at various locations in the metropolitan Minneapolis-St. Paul area, by means of trucks equipped for cleaning operations. Harry H. Creamer, for many years, had controlled and managed the corporation's business affairs. Creamer died on September 21, 1951, and, subsequent to his death, S. C. Sorensen, a long-time employee and director of the corporation, assumed control of the corporation's business affairs. Sorensen died on August 26, 1953. At some undisclosed time shortly thereafter, the then stockholders of the corporation secured the services of Frithiof T. Christensen, hereinafter called petitioner, to control and manage the corporation's affairs at no salary.

The corporation's outstanding capital stock consists of 1,000 shares. Prior to his death, Harry H. Creamer owned 750 of such shares, the remaining shares being held in trust by or for the benefit of Harry H. Creamer's immediate family. Subsequent to his death, the shares owned by Harry H. Creamer were distributed in accordance with

his last will and testament. The corporation's stockholders subsequent to his death were as follows:

|  | Shares |
|---|---|
| Trustees under the trust agreement executed by Harry H. Creamer, prior to his death | 250 |
| Trustees under testamentary trust set forth in Harry H. Creamer's last will and testament | 186.45 |
| Dorothy K. Creamer | 377.10 |
| Jane Ann Creamer Mullery | 93.225 |
| Carol K. Creamer Stovall | 93.225 |

The corporation's stockholders, during the month of September 1953, commenced negotiations with petitioner with respect to a sale of all the corporation's outstanding stock. During the period of negotiation the corporation's assets included, among other things, the following items: (a) A valid indebtedness owing to the corporation from the estate of Harry H. Creamer, in the amount of $2,073.44; (b) a life insurance policy on the life of Jane Creamer Mullery, which policy possessed a cash surrender value of not less than $3,150.

On October 2, 1953, petitioner offered to purchase all the outstanding stock of the corporation. This offer was made at a meeting in the Northwestern National Bank. An official of the bank's trust department summarized the offer in memorandum form immediately after the meeting. The memorandum contains the following pertinent notations:

1. Purchase price to be $66,000, with a down payment of $15,000 cash.

2. In addition to the above purchase price it is agreed that the Harry C. Creamer accounts receivable on the company's books, in the amount of $2,073.44, and the life insurance policy on the life of Jane Mullery having a cash value as of December 31 of $3,150.00 will be assigned to the stockholders.

3. If there is any advantage from the seller's standpoint, the purchaser agrees to add the amounts represented by "2" above to the purchase price and then to be assigned as additional down payment. * * *

These negotiations resulted in a written agreement dated October 1, 1953, wherein the stockholders agreed to sell and petitioner agreed to buy all the corporation's outstanding stock. Execution of this written agreement was not completed until November 30, 1953.

The written agreement specified, in part, the consideration to be paid for the stock purchased in the following terms:

1. The purchase price is the sum of $69,780.00 to be paid by buyer as follows: $18,780.00 in cash at the execution hereof, receipt of which is hereby acknowledged, and the balance of $51,000.00, with interest thereon at 5% per annum in 120 monthly installments as follows: $540.96 on or before November 20, 1953, and the sum of $540.96 on or before the 20th day of each succeeding month thereafter until said purchase price with interest as aforesaid is paid in full.

Said initial cash payment of $18,780.00 is acknowledged to be received herewith entirely in cash or $15,000.00 thereof in cash and $3,780.00 by the assignment to sellers of life insurance policy issued by Canada Life Assurance Com-

pany, No. 852791, dated March 2, 1948, in the principal amount of $30,000.00 upon the life of Jane Creamer Mullery with all premiums paid which had heretofore matured and which policy has the cash surrender value of approximately $3,780.00.

Buyer shall also in addition to the payment of said purchase price of $69,780.00 as above provided cause said corporation to assign to sellers that certain account receivable upon its books against Harry H. Cremer, [sic] deceased, in the sum of $2073.44.

Under the terms of the written purchase agreement, legal title to the corporation's stock would remain in the sellers until payment of the purchase price had been made in full. An escrow agent would hold the stock. Additional provisions contained in the written purchase agreement concerning the conduct of corporate affairs during the life of the contract, among others, were as follows: (a) A prohibition against the payment of salaries to corporate officers in excess of certain specified amounts; (b) a prohibition against the issuance of additional stock; (c) a prohibition against the sale of corporate real estate unless the sellers consent to such sale or unless the cash price paid equals the balance due under the terms of the contract and the sale proceeds are applied in satisfaction of such balance; and (d) a prohibition against using the proceeds of any mortgage or other lien placed upon corporate real estate or fixed assets for other than corporate purposes.

The written purchase agreement specifically provided that petitioner could declare and receive corporate dividends when and if justified by the corporation's business during the life of the contract, provided the dividends so declared and received were applied upon any balance owing under the terms thereof. Petitioner, the written purchase agreement provided, should have and exercise exclusive voting rights to vote the corporation's stock, in the election of directors and all other matters, to the end that petitioner would have control of the operation and management of the business of the corporation during the life of the written agreement, subject to the restrictions noted above, and subject to the petitioner's timely performance of his payment obligations.

The purchase transaction's closing occurred on November 30, 1953, when execution of the written purchase agreement was completed, the corporation's stockbook was delivered to the escrow agent designated in the written purchase agreement, petitioner and his nominees assumed office as the corporation's directors, and a $15,000 payment was made by petitioner pursuant to the terms of the written purchase agreement.

Petitioner, in a letter dated November 30, 1953, addressed to the escrow agent, formally recited that the payments were being made and other steps were being taken in conformity with the agreement

dated October 1, 1953, including surrender of the insurance policy and assignment of the Harry H. Creamer debt. An officer of the escrow agent signed a receipt at the bottom of said letter on November 30, 1953.

The corporation received a check dated December 11, 1953, in the amount of $3,780, drawn on the Canada Life Assurance Society representing the proceeds from the surrender of the life insurance policy referred to above. Petitioner endorsed this check as a corporate officer, then transmitted the check to the escrow agent pursuant to the terms of the agreement stated in the letter dated November 30, 1953.

The corporation's board of directors and stockholders at a meeting held on December 22, 1953, passed a resolution canceling the Harry H. Creamer indebtedness referred to above.

At least one of the parties designated as seller in the written purchase agreement, holding at least 25 per cent of the corporation's outstanding capital stock, treated the disposition of the insurance policy and the account receivable as giving rise to taxable capital gains.

The corporation received no consideration or other thing of value in return for the surrender of the insurance policy's cash surrender value and the cancellation of the indebtedness. The corporation, at all times during the year 1953, possessed accumulated earnings and profits sufficient to declare a taxable dividend, as defined by the applicable provisions of the Code of 1939, substantially in excess of $6,041.64.

Petitioner did not default at any time in performing any obligations imposed upon him by the provisions of the contract dated October 1, 1953.

Petitioners concede that the amount of $188.20, representing premium payments on a certain insurance policy, which is included in the amount of $6,041.64 of dividend income set forth in the deficiency notice, constitutes dividends received by the petitioners during the year 1953.

There is no question but that the distributions effected by the corporation when it cashed the life insurance policy and assigned its proceeds and canceled the Harry H. Creamer indebtedness constitute dividends. The only problem raised is whether petitioner is taxable for such dividends under section 22(a) of the 1939 Code. See *De Guire* v. *Higgins*, 159 F. 2d 921, 923 (C.A. 2, 1947). It is petitioner's contention that the dividends should not result in his being taxed and that the tax burden should rightfully fall upon the sellers of the corporation's stock. We hold this contention to be erroneous.

Where an issue arises concerning whether the seller or buyer of corporate shares has received a dividend, it has been uniformly held that the income is taxable to the party beneficially in control of the stock. See *Mayer* v. *Donnelly*, 247 F. 2d 322 (C.A. 5, 1957), and *Estate of Arthur L. Hobson*, 17 T.C. 854 (1951), in which the buyer was held to be the beneficial owner at the time the dividend was declared. Cf. *Merrill C. Gilmore*, 25 T.C. 1321 (1956); *Sam E. Wilson, Jr.*, 27 T.C. 976 (1957), affd. 255 F. 2d 702 (C.A. 5, 1957); *T. J. Coffey, Jr.*, 14 T.C. 1410 (1950), in each of which the seller was held to be the beneficial owner.

There is no merit to petitioner's contention that the dividend was informally declared by the sellers during the negotiation period. The agreement for the sale of the corporation's stock to petitioner executed on November 30, 1953, represents the culmination of the negotiations between buyer and sellers. Its terms are clear and unambiguous. The sale price is stated to be $69,780, and not $66,000, which latter figure had been recited in an earlier offer of petitioner. No doubt the $3,780 difference represents the value of the insurance policy; nevertheless, in the final agreement this sum was treated as an integral part of the sales price. The final agreement also provides that petitioner "in addition" would cause the corporation to assign to the sellers the Harry H. Creamer debt. Petitioner, in his offer, had expected this possibility and had stated that the value of the insurance policy and the Harry H. Creamer debt might be added to the purchase price "[i]f there is any advantage from the seller's standpoint." What advantage the sellers had in mind is not clear, but the agreement is clear in that it recites the value of the insurance policy and the debt as part of the consideration for the sale.

On November 30, 1953, as indicated by petitioner's letter to the escrow agent, petitioner paid $15,000 to the escrow agent; he later caused the corporation to cash the insurance policy and thereafter petitioner as a corporate officer endorsed the insurance check dated December 11, 1953, over to the escrow agent. Petitioner caused the corporation to cancel the Harry H. Creamer debt on December 22, 1953. It is clear that the dividends were declared after November 30, 1953. It might also be noted that, strictly speaking, neither the insurance policy nor the debt was assigned to the sellers. The policy was cashed and the debt was canceled. The sellers actually did not receive the specific assets which petitioner maintains they reserved to themselves.

On November 30, 1953, petitioner acquired voting rights and control of corporate management, subject only to his continued performance of the agreement's terms. Petitioner, if corporate business justified it, was able to have dividends declared and the escrow agent

was to be given such dividends to be applied against the balance of the unpaid purchase price. The sellers retained title to the shares as a security device; and also retained certain powers to prevent petitioner from depleting corporate assets in a manner which might jeopardize the value of the security. On and after November 30, 1953, petitioner was the beneficial owner of the outstanding shares of the corporation. See *Mayer* v. *Donnelly* and *Estate of Arthur L. Hobson*, both *supra*.

In any event, we think it clear that petitioner, while the beneficial owner of the corporation's stock, caused the corporation, which was not a party to the stock sale, to supply certain elements of the consideration which petitioner was obliged to pay the sellers for the purchase of stock. This inevitably leads to the conclusion that, as a result, petitioner received taxable dividends. Respondent is accordingly sustained.

*Decision will be entered under Rule 50.*