WILLIAM F. WOLF, JR., AND GERTRUDE D. WOLF, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 869-63—875-63. Filed February 17, 1965.

*Richard P. Ragland, Richard O. Kummert,* and *Clyde E. Tritt,* for the petitioners.

*Paul G. Wilson,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable year 1958 as follows:

---

[1] The following proceedings are consolidated herewith: Tami Lee Wolf, Minor, William F. Wolf, Jr., Guardian, docket No. 870-63; William F. Wolf III, minor, William F. Wolf, Jr., Guardian, docket No. 871-63; Gayl Ann Wolf, Minor, William F. Wolf, Jr., Guardian, docket No. 872-63; Boni L. Wolf, Minor, William F. Wolf, Jr., Guardian, docket No. 873-63; Terry J. Wolf, Minor, William F. Wolf, Jr., Guardian, docket No. 874-63; and Qualified Minor's Trust for Lesli Jean Wolf, William F. Wolf, Jr., Trustee, docket No. 875-63.

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 869–63 | William F. Wolf, Jr., and Gertrude D. Wolf | $15,083.43 |
| 870–63 | Tami Lee Wolf, minor, William F. Wolf, Jr., guardian | 446.96 |
| 871–63 | William F. Wolf III, minor, William F. Wolf, Jr., guardian | 446.96 |
| 872–63 | Gayl Ann Wolf, minor, William F. Wolf, Jr., guardian | 446.96 |
| 873–63 | Boni L. Wolf, minor, William F. Wolf, Jr., guardian | 446.96 |
| 874–63 | Terry J. Wolf, minor, William F. Wolf, Jr., guardian | 446.96 |
| 875–63 | Qualified Minor's Trust for Lesli Jean Wolf, William F. Wolf, Jr., trustee | 607.22 |

The parties having agreed that the Qualified Minor's Trust for Lesli Jean Wolf was not in existence in 1958, the respondent concedes error in his determination of a deficiency against such trust, but has amended his answer to make claim for additional deficiences from each of the other petitioners.

The issues presented for decision are whether the transfer by a partnership (composed of all the petitioners, except the Lesli Jean Wolf Trust) of its stock of a corporation to a newly formed corporation in exchange for stock of such newly formed corporation and the assumption by the newly formed corporation of the personal liability of the partnership for its remaining unpaid liability on its purchase of stock of the old corporation constituted a nontaxable exchange under section 351(a) of the Internal Revenue Code of 1954, or whether the assumption and payment by the new corporation of the liability of the partnership constituted in substance the payment of a dividend by the old corporation.

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

The petitioners, William F. Wolf, Jr., and Gertrude D. Wolf, are husband and wife residing at 425 South June Street, Los Angeles, Calif. They filed a joint income tax return for the taxable year 1958, on the cash receipts and disbursements method of accounting, with the district director of internal revenue at Los Angeles. The other petitioners are the minor children of the petitioners William F. and Gertrude D. Wolf, and also reside at 425 South June Street in Los Angeles. The petitioner William F. Wolf, Jr., who will hereinafter be referred to as the petitioner, is the duly appointed guardian of the estates of his minor children, Tami Lee, William F., Gayl Ann, Boni L., and Terry J. Wolf. Such minor children maintained records on the cash receipts and disbursements method of accounting. No income tax returns were filed on their behalf for the taxable year 1958.

The petitioner started working in the machine-tool business in 1937. In 1947 he became associated, as a salesman, with Harron, Rickard & McCone Co. of Southern California (hereinafter referred to as Harron), a corporation which engaged in the sale of machine tools.

In 1951 he left Harron and formed a sole proprietorship to engage in the sale, rental, leasing, and distribution of machine tools.

On October 14, 1953, petitioner and his wife formed a limited partnership under the name of W. F. Wolf Machinery Co. (the name of which was later changed to W. F. Wolf Investment Co., which will hereinafter be referred to as Partnership), and each transferred to Partnership an undivided one-half interest in the business previously conducted by the petitioner as a sole proprietorship. Petitioner was the general partner and his wife was a limited partner. On October 29, 1953, they transferred to each of the minor children named above an undivided 7-percent limited-partnership interest in Partnership.

In July 1954, Mulvey White and Charles Haynes each acquired from Alex Todd 50 percent of the stock of Harron, Todd remaining as a member of the board of directors until about November 1955. Neither White nor Haynes had had much experience in the machine-tool sales business and were desirous of securing an experienced sales manager for Harron. They offered the position of sales manager to the petitioner. Petitioner agreed to accept the position on condition that either he or Partnership would ultimately obtain a one-third interest in Harron.

On July 30, 1955, Harron entered into an agreement with petitioner whereby petitioner was employed as sales manager for a term of 5 years with a fixed salary of $1,500 per month and additional annual compensation of 10 percent of Harron's net profits. (At the same time Harron entered into employment agreements with White, as comptroller, and Haynes, as general manager, for the same term and at the same compensation.) In August 1955, Partnership transferred all of its assets to a newly formed corporation, W. F. Wolf Machinery Co., in exchange for its stock. Thereafter Partnership transferred to Harron all the outstanding stock of W. F. Wolf Machinery Co.[2] in exchange for 621 shares of Harron's stock. Such exchange was made on the basis of the relative net book values of the stock of the two corporations. The 621 shares of stock of Harron received by Partnership did not amount to one-third of the stock of Harron. Accordingly, Partnership purchased 126⅓ shares of stock of Harron from White and an equal amount from Haynes, which resulted in the holding by Partnership of a one-third interest in Harron. The purchase price of each block of 126⅓ shares was $33,286, for which Partnership, by petitioner as general partner, gave promissory notes dated November 10, 1955, payable over a period of 10 years in annual payments with interest at 3 percent per annum. Partnership, by petitioner, pledged 336⅝ shares of Harron stock as collateral security for each note. At the time of the execution of these notes Partnership

---

[2] The record does not disclose whether such corporation remained in existence, but it is unimportant to a consideration of the case.

had no cash on hand and virtually no assets except stock of Harron.

Haynes continued as president of Harron and White continued as vice president. The directors of Harron were the petitioner, White, Haynes, Todd, and Clyde E. Tritt, legal counsel for Harron.

During the interim between July 1955 and early 1957, serious differences of opinion developed between petitioner and White concerning matters of corporate business policy. Among the areas of disagreement was the level of inventory which Harron should maintain in order to provide proper customer service and also the use of recourse guarantees in connection with conditional sales contracts. The relations between them deteriorated to such an extent that petitioner in early 1957 attempted unsuccessfully to purchase White's stock interest in Harron. Petitioner and White continued through 1957 to try to resolve their policy differences, but could not do so. In early 1958 negotiations were resumed looking toward a withdrawal by both White and Haynes from the corporation, it being understood that each would receive an amount based upon the book value of his stock. In the negotiations petitioner and White were represented by counsel, petitioner's counsel being Clyde E. Tritt. White insisted, in connection with any purchase of his stock, that he be paid $50,000 down, that any balance of purchase price to be covered by a promissory note should be secured by a pledge of stock of Harron, and that he be given an employment contract to cover the period of the note. White also insisted that he be paid immediately the principal amount, plus interest, then due him by Partnership on the November 10, 1955, note which had been given him in connection with the purchase by Partnership of the 126⅓ shares of Harron stock. Such principal amount remaining unpaid was $26,628.80, and the interest was $399.43, or a total of $27,028.23. Haynes also insisted upon a downpayment of $50,000 upon the sale of his stock. White and Haynes each also insisted that another installment of $50,000 be paid shortly thereafter. White did not require, as a condition to any sale of his Harron stock, that Haynes' stock be also purchased.

The petitioner relied upon Tritt to suggest the means of accomplishing the desired result. Tritt investigated various means. He considered having Harron redeem the stock of both White and Haynes, but he recommended against this method because he thought there was risk that such redemption would, upon the basis of certain outstanding Tax Court decisions,[3] be considered as the payment of a dividend to the remaining stockholder, Partnership. Consideration was also given to having Partnership purchase the shares of White and Haynes, but it did not have the cash needed for the required downpayment. It never had more than $600 in its bank account during the period Decem-

---

[2] *Joseph Holsey*, 28 T.C. 962, revd. Sept. 3, 1958, (C.A. 3) 258 F. 2d 865; and *Fred C. Niederkrone*, T.C. Memo. 1956-255, revd. Nov. 10, 1958, (C.A. 9) 266 F. 2d 238.

ber 1957 through April 1958. Nor did any of the partners have the required cash. Tritt then suggested, and there was adopted, the method hereinafter described, of accomplishing the desired result.

On February 13, 1958, there was formed a California corporation, W. W. Machinery Co. (hereinafter referred to as Machinery), with authorized capitalization of 35,000 shares of $10 par value common stock and 1,500 shares of $100 par value 6-percent cumulative preferred stock. On March 4, 1958, its board of directors consisted of petitioner, White, Haynes, and Tritt.

On March 4, 1958, White and Haynes entered into an agreement with Machinery, each agreeing, among other things, to transfer to Machinery 873⅔ shares of Harron stock (which was all the stock they owned in Harron) for the respective amounts of $328,000 and $325,000.[4]

On March 31, 1958, Partnership transferred to Machinery its 873⅔ shares of stock of Harron (which had a basis of $230,201.40), receiving therefor 26,220 shares of common stock of Machinery (which had a fair market value of $326,500). Machinery also assumed $54,056.46 of Partnership's liabilities, representing the unpaid principal balance of $26,628.80 and accrued interest on each of the promissory notes which Partnership had executed in favor of White and Haynes in 1955 on account of the purchase price of 126⅓ shares of Harron stock from each of White and Haynes.

On March 31, 1958, in accordance with the provisions of the abovementioned agreement of March 4, 1958, Machinery sold 1,000 shares of its preferred stock for $100,000 to Title Insurance & Trust Co., as trustee for the Harron employees profit-sharing retirement trust. On the same day Haynes and White each transferred 873⅔ shares of Harron stock to Machinery, and Machinery paid each of them $50,000 in cash. Machinery executed in favor of White a demand note in the principal amount of $27,028.23 and an installment promissory note in the principal amount of $278,000, each bearing interest at the rate of 6 percent per annum. Machinery also executed in favor of Haynes an installment promissory note in the amount of $302,028.23, bearing interest at 6 percent per annum.

By instrument dated March 31, 1958, Partnership and the petitioner personally guaranteed payment of the promissory notes of $278,000 and $302,028.23 given by Machinery to White and Haynes, respectively, and Partnership pledged a total of 26,220 shares of Machinery stock as security for the payment of both notes.

On March 31, 1958, Machinery entered into new employment agreements with the petitioner, White, and Haynes. Petitioner and Haynes each was to receive $1,500 per month for a 5-year period, plus 10

---

[4] There is no explanation of the difference in the amounts to be paid White and Haynes.

percent of the net profits of Machinery, and White was to receive $1,000 per month as a consultant for a 3-year period.

On March 31, 1958, Machinery executed a certificate (which was filed with the secretary of state of the State of California on April 8, 1958) stating that it had been resolved by the board of directors to merge Harron into Machinery and change the name of Machinery to Harron, Rickard & McCone Co. of Southern California (hereinafter referred to as New Harron). The merger was effected, the precise date not being shown.

White continued as an employee of New Harron until February 17, 1959, when his employment contract with New Harron was terminated by mutual agreement. Haynes continued as an employee of New Harron until April 1, 1962.

The promissory notes given by Machinery to White and Haynes were paid on the following dates:

The demand note from Machinery to White for $27,028.23—paid in full by New Harron on Apr. 11, 1958;

The installment note from Machinery to White for $278,000—
New Harron paid $44,000 on May 6, 1958;
New Harron paid $8,333.33 on Jan. 1, 1959;
New Harron paid $8,333.33 on Feb. 1, 1959;
New Harron paid balance on Feb. 16, 1959.

Installment note from Machinery to Haynes for $302,028.23—
New Harron paid $47,000 on May 16, 1958;
New Harron paid $8,333.33 on Jan. 1, 1959;
New Harron paid $8,333.33 on Feb. 1, 1959;
New Harron paid balance on Feb. 13, 1959.

The accumulated earnings and profits of Harron as of March 31, 1958, were in excess of $56,739.46.[5] The current earnings and profits of New Harron at the end of the taxable year ended March 31, 1959, were in excess of $56,739.46.

In the notices of deficiency for the year 1958 the respondent determined that as a result of the above transactions Partnership had received taxable dividends of $54,046.46, and that each partner was taxable upon his distributable share. He determined that the joint share of the petitioners, William F. and his wife Gertrude, was $31,346.95 and that the share of each of their six minor children was $3,783.25. The respondent's explanation was as follows:

It has been determined that the 1958 transaction in which W. W. Machinery Co., in connection with the acquisition of the stock of Harron, Rickard & McCone Co. of Southern California, assumed certain liabilities of W. F. Wolf Investment Co. (a partnership of which you were members (or a member, as the case may be)), was not entered into for a bona fide business purpose and was entered into to avoid federal tax. The assumption of the liabilities constitutes the receipt of money and is a taxable dividend. The income thus qualifying as partnership dividend income is taxable to you to the extent of your distributive share thereof.

---

[5] The income tax return filed by Harron for the period ended Mar. 31, 1958, showed earnings and profits of $525,510.32.

OPINION

The respondent contends that the assumption and payment by Machinery of Partnership's liability of $54,046.46 (the principal amount plus interest remaining to be paid by Partnership to White and Haynes on the purchase price of its stock of Harron) constituted in reality the payment by Harron of a dividend to Partnership in 1958, and that hence the petitioners are taxable on such amount as ordinary income to the extent of their distributable partnership shares.

The petitioners contend that the transaction, of which the assumption was a part, was a nontaxable transaction within the meaning of section 351 of the Internal Revenue Code of 1954,[6] and that, therefore, the respondent's determination was erroneous. The respondent contends that the transaction does not fall within section 351 of the Code. He contends, alternatively, that if it does, the liability assumed is to be considered as money received by Partnership on the exchange under section 357 of the Code,[7] and that, therefore, gain should be recognized to that extent, pursuant to section 351(b) of the Code, it being his position that the principal purpose in carrying out the transaction in the form adopted and in arranging for the assumption of the liability

---

[6] SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

(b) RECEIPT OF PROPERTY.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

[7] SEC. 357. ASSUMPTION OF LIABILITY.

(a) GENERAL RULE.—Except as provided in subsections (b) and (c), if—

(1) the taxpayer receives property which would be permitted to be received under section 351, 361, 371, or 374 without the recognition of gain if it were the sole consideration, and

(2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability,

then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351, 361, 371, or 374, as the case may be.

(b) TAX AVOIDANCE PURPOSE.—

(1) IN GENERAL.—If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)—

(A) was a purpose to avoid Federal income tax on the exchange, or

(B) if not such purpose, was not a bona fide business purpose, ·

then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351, 361, 371, or 374 (as the case may be), be considered as money received by the taxpayer on the exchange.

(2) BURDEN OF PROOF.—In any suit or proceeding where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

was a purpose to avoid tax on the exchange, and that the petitioners have failed to prove the contrary by the clear preponderance of the evidence. The petitioners in turn contend that the purpose of the transaction, including the assumption, was not a purpose to avoid tax on the exchange and that the purpose was a bona fide business purpose.[8] In the alternative, the petitioners contend that in any event any gain which might be recognized on the exchange is long-term capital gain.

The respondent does not deny that there was literal compliance with section 351, but contends that the substance of the transaction was not an exchange within the scope of that section. He takes the position that when all the steps are viewed as integral parts of a single transaction, it appears that Machinery was created as a mere temporary repository for the Harron stock; that the net effect of the transaction was the redemption by Harron of the Harron stock owned by White and Haynes (leaving Partnership as the sole stockholder) and the assumption by Harron of Partnership's person liability for the remaining unpaid purchase price, plus interest, of Partnership's Harron stock; that in reality there was, therefore, no transfer of property in exchange for stock within the contemplation of section 351 of the Code; and that the assumption and payment of Partnership's liability constituted in reality the payment by Harron (through the medium of Machinery) of a dividend to Partnership in the amount of the liability assumed and paid.

Section 351 (which is the successor to sec. 112(b)(5) of the Internal Revenue Code of 1939) is a so-called nonrecognition provision pursuant to which *gain* upon the *exchange* of property for stock of a controlled corporation is deferred until some later taxable event has occurred. *Helvering* v. *Cement Investors, Inc.*, 316 U.S. 527; *Jewell* v. *United States*, (C.A. 9) 330 F. 2d 761; and *Barker* v. *United States*,

---

[8] Briefly stated, the contention is that due to the dissension between petitioner and White it was necessary, in the interest of the business, that White be eliminated from the business; that White insisted that, if he relinquished his interest in Harron, he be paid a downpayment of $50,000 immediately, and be paid shortly thereafter an installment of $50,000; that Haynes made the same demands as a condition to the relinquishment of his interest; that White also insisted that simultaneously he be paid the remaining liability of $27,028.23 owing to him from Partnership on account of Partnership's prior purchase of Harron stock from him; that Partnership did not have cash available to pay any of these demands and had no means of obtaining cash; and that Harron did not itself redeem the stock of White and Haynes because of the possibility that in such event the redemption might be considered as resulting in the payment of a dividend by Harron to the remaining stockholder, Partnership, in view of certain then-existing Court opinions referred to in the Findings of Fact.

Actually, there has been no showing that the elimination of Haynes as a stockholder was necessary in the interest of the proper running of the business. Furthermore, although it has been shown that Partnership did not have the cash required to be paid immediately on any purchase of the interest of White and Haynes, or indeed of the interest of White alone, the evidence does not establish that Partnership could not have obtained the necessary cash by borrowing on the security of its own Harron stock (which was then pledged to secure the amounts due White and Haynes) and any other Harron stock which might be purchased from White and Haynes.

(C.A. 9) 200 F. 2d 223. Section 357 (which is the successor to sec. 112 (k) of the Internal Revenue Code of 1939) provides, in effect, that consideration received by the transferor in the form of an assumption. of the transferor's liability shall not be considered as money or property received unless the principal purpose with respect to the assumption was a purpose to avoid tax on the exchange or was not a bona fide business purpose.

Our first consideration is whether there was an exchange within the meaning of section 351, in which one of the considerations flowing was the assumption of Partnership's liability.

It is well established that the incidence of taxation depends upon the substance of a transaction. *Gregory* v. *Helvering*, 293 U.S. 465; *Griffiths* v. *Helvering*, 308 U.S. 355; *Higgins* v. *Smith*, 308 U.S. 473; *Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *Bazley* v. *Commissioner*, 331 U.S. 737; *United States* v. *Mattison*, (C.A. 9) 273 F. 2d 13; and *Factor* v. *Commissioner*, (C.A. 9) 281 F. 2d 100, certiorari denied 364 U.S. 933.[9]

Partnership was a stockholder of Harron which was engaged in the active conduct of a business and which had a large amount of accumulated earnings and profits. Had Harron directly redeemed the stock held by White and Haynes, leaving Partnership as the sole stockholder of Harron, and had then assumed and paid Partnership's personal liability for the amount remaining unpaid on its purchase of its Harron stock, there would be no question that Harron had paid Partnership a dividend in the amount of the personal liability assumed and paid. *Wall* v. *United States*, (C.A. 4) 164 F. 2d 462; *Zipp* v.

---

[9] In *Gregory* v. *Helvering*, 293 U.S. 465, it was stated in part:
"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. *United States* v. *Isham*, 17 Wall. 496, 506; *Superior Oil Co.* v. *Mississippi*, 280 U.S. 390, 395–396; *Jones* v. *Helvering*, 63 App. D.C. 204; 71 F. (2d) 214, 217. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * * *
"* * * No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death.
"* * * The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."
In *Higgins* v. *Smith*, 308 U.S. 473, it was stated in part:
"A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages.[10]
"On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. * * *" (Footnote omitted.)

*Commissioner*, (C.A. 6) 259 F. 2d 119, certiorari denied 359 U.S. 934; *Sachs* v. *Commissioner*, (C.A. 8) 277 F. 2d 879, certiorari denied 364 U.S. 833; and *Frithiof T. Christensen*, 33 T.C. 500. Instead of taking this direct course, the transaction in the instant case took the form of the creation of a new corporation, Machinery, the transfer thereto by White and Haynes of their Harron stock for cash and promissory notes, and the transfer thereto by Partnership of its Harron stock for stock of Machinery and the assumption of Partnership's remaining liability on the purchase of its Harron stock, the almost immediate merger of Harron into Machinery (whose name was at the same time changed to Harron), and the continuation of the same business which had theretofore been carried on by Harron. Viewing all the steps taken as parts of a single transaction, as both parties agree they should be considered, and looking to the substance and net effect of the transaction, we think that in reality it was Harron which redeemed the stock of White and Haynes and assumed and paid [10] the personal liability of Partnership. It is true, as the petitioners point out, that Machinery was a valid corporation and that legally and technically it was the entity which survived the merger. However, we think it immaterial which corporation continued. The effect was the same as if Harron had continued and Machinery had been put to death. Under the circumstances, we think the use of Machinery cannot be deemed sufficient to establish an exchange within the contemplation of section 351. See *Gregory* v. *Helvering*, *supra*, in which the use of a temporary corporation was held not sufficient to qualify a transaction as a reorganization within the meaning of the taxing statutes. Hence, we cannot recognize that the assumption by Machinery was incident to an exchange coming within the provisions of section 351. Rather, we think the substance of the transaction was the payment by Harron of a dividend to Partnership in the amount of the liability assumed and paid. The petitioners strongly urge that the purpose of the transactions was not the tax-free withdrawal of Harron's earnings. However, as clearly pointed out in *Gregory* v. *Helvering*, *supra*, what actually occurred is decisive, rather than the taxpayer's motive. And it should be pointed out that to hold, as the petitioners would have us do, that the assumption in question was incident to an exchange under section 351 would result, not in the postponement of recognition of *gain* on an *exchange*, but in the escape of tax upon a dividend.

We have carefully considered *Jewell* v. *United States*, *supra*, heavily relied upon by the petitioners. There the taxpayer, who owned

---

[10] In the taxable year 1958 the demand promissory note in the amount of $27,028.23 issued by Machinery to White was paid in full. A like amount which Partnership owed to Haynes was assumed by Machinery and was included in a larger note for $302,028.23 given by Machinery to Haynes. During 1958, $47,000 was paid on such note.

stock of a corporation, purchased additional stock from a trust, giving the trust a promissory note therefor. At the same time another individual, Clack, purchased the remainder of the corporate stock from the trust, giving a promissory note for the purchase price thereof. Thereupon the taxpayer and Clack liquidated the corporation and transferred the assets to a partnership which they formed. The promissory notes were entered on the books of the partnership as liabilities of the partnership, but the trust did not relieve the taxpayer or Clack of their personal liability. The business was carried on by the partnership for a period in excess of 6 months, when the partnership was dissolved, taxpayer taking 21 percent of the assets and Clack taking 79 percent thereof. They then organized two corporations, transferring thereto their respective interests in the assets received by them on the dissolution of the partnership and taking stock in the corporations in proportion to their interests stated above. One of the corporations assumed, as a part of the transaction, the liabilities of the individuals upon their notes owing to the trust, and issued new notes to the trust. The trust thereupon canceled the notes of the individuals. During the taxable years 1953 through 1957 the corporation made annual payments of principal and interest on its notes to the trust. It was contended by the Government that the payments made on the note by the corporation with respect to the taxpayer's erstwhile liability to the trust constituted payments of dividends to the taxpayer, relying upon *Wall* v. *United States*, *supra*. The court held that the payments by the corporation on the note which it had given did not constitute constructive dividends to the taxpayer since there had been a complete novation and the payment did not constitute the payment of a liability of the taxpayer. We think that case is not analagous to the instant case. No contention was there made that all the steps taken constituted integral parts of a single transaction resulting, in substance, in the payment by the original corporation of a dividend to the taxpayer as one of its stockholders. Rather, the liquidation of the original corporation was treated as a separate transaction (which would have separate tax consequences). The court there went on to conclude that the assumption of the taxpayer's liability was a part of the consideration in an exchange falling within the provisions of section 112 (b) (5) and (k) of the Internal Revenue Code of 1939. For reasons stated hereinabove, we consider all the steps taken in the instant case as integral parts of one transaction, resulting in the payment of a dividend by Harron, and that the transaction does not fall within the provisions of section 351.

*Decisions will be entered under Rule 50.*