Jay F. Walker and Beatrice Walker v. Commissioner. Newell E. Fait and Helen B. Fait v. Commissioner.
Walker v. Commissioner
Docket Nos. 1482-70 and 1666-70.
United States Tax Court
T.C. Memo 1972-223; 1972 Tax Ct. Memo LEXIS 36; 31 T.C.M. (CCH) 1109; T.C.M. (RIA) 72223; October 26, 1972
Frank DeMarco, Jr., 44th Floor, North Tower, Atlantic Richfield Plaza, 515 S. Flower St., Los Angeles, Calif., and Weston L. Johnson, for the petitioners in Docket No. 1482-70. James M. Murphy, for the petitioners in Docket No. 1666-70. Sheldon Sisson, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the Federal income tax of petitioners Jay F. and Beatrice Walker for the calendar year 1964 in the amount of $23,697.69. Respondent determined a deficiency in the Federal income tax of petitioners Newell E. and Helen B. Fait for the calendar year 1964 in the amount of $38,905.54. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision whether an amount declared by Arden Plymouth, Inc., as a dividend *37 to Jay F. Walker immediately prior to Newell E. Fait's formally exercising his option to purchase the stock held 1110 in that corporation by Walker was a dividend to Walker or a dividend to Fait as an amount paid by the corporation in discharge of part of Fait's purchase price of Walker's stock. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Jay F. and Beatrice Walker are husband and wife who resided at Corona Del Mar, California, at the time of the filing of their petition in this case, Jay F. and Beatrice Walker filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue, Los Angeles, California. Petitioners Newell E. and Helen B. Fait are husband and wife who resided at Corona Del Mar, California at the time of the filing of their petition in this case. Newell E. and Helen B. Fait filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue, Los Angeles, California. Newell E. Fait (hereinafter referred to as Fait) is a businessman with investments in various enterprises, including several automobile dealerships. *38 Jay F. Walker (hereinafter referred to as Walker) was associated with Fait for approximately 20 years as an employee and as a part owner in corporations which were controlled by Fait. On or about August 19, 1958, Walker and Fait executed an agreement relating to their joint participation in business ventures and to Walker's performance of services on behalf of such business ventures. Under the provisions of the agreement Walker was to devote all of his time, talents, abilities, and efforts to the management of businesses owned by either Fait or Walker. In addition, Walker agreed to promote and procure new businesses for the betterment of the financial position of both Fait and Walker. Under the provisions of the agreement, Fait was to give Walker an option to own at least a 25 percent interest in any business investment made by Fait after the date of the agreement. In the event that Walker was to terminate his employment or cease to be an officer in any business controlled by Fait, Fait had an option for a period of 45 days to purchase all stock, partnership, or other interests in such business owned by Walker. If Fait did not exercise his option within the 45-day period, then *39 Walker had a similar option for 45 days. The purchase price of any stock or other interest would be at book value as determined by the independent auditor servicing the business and would be computed as of the end of the month next preceding the month in which Walker's employment was terminated. On or about January 13, 1963, Arden Plymouth, Inc. (hereinafter referred to as Arden Plymouth) was incorporated under the laws of the State of Delaware. Chrysler Motors Corporation subscribed to all of the stock initially issued by Arden Plymouth. Arden Plymouth was in the business of conducting a Plymouth automobile dealership in Sacramento, California. On November 22, 1963, Fait purchased all of the then outstanding shares of Arden Plymouth (311 shares of common stock) from Chrysler Motors Corporation for $17,186.76. The purchase price was the book value of the stock after the corporation had declared a dividend of all its earnings and profits to its sole shareholder, Chrysler Motors Corporation. In connection with this purchase Fait was required to personally guarantee the indebtedness of Arden Plymouth in the amount of approximately $20,000. On November 22, 1963, Fait and Paul J. *40 Prestel, general manager of Arden Plymouth, entered into an agreement entitled, "Stock Purchase Option and Shareholders Agreement." This agreement granted Prested the right to purchase up to 49 percent of the stock of Arden Plymouth over a period of 4 years. Prestel had an additional right thereafter to purchase the remaining 51 percent of the stock of Arden Plymouth if written consent to the purchase could be obtained from Chrysler Motors Corporation. The agreement granted to Fait the option to repurchase any shares which Prestel had acquired until such time as Prestel had acquired the entire 311 shares. The Stock Purchase Option and Shareholders Agreement set both the purchase price by Prestel of the shares of Arden Plymouth and the repurchase price by Fait at book value at the close of the last monthly accounting period preceding the exercise of the option to purchase. The agreement provided the method of computing book value of the stock. It further provided that if the stockholders of Arden 1111 Plymouth had made a binding election and filed the required forms to be taxed as a partnership under the provisions of section 1372, I.R.C. 1954, [1] the *41 book value of Arden Plymouth was to be computed by treating all currently reportable profits of the corporation as a current liability owing to the shareholders rather than as part of the corporation's net worth or earned surplus. Immediately after his purchase of the Arden Plymouth stock on November 22, 1963, Fait sold the number of shares of stock of Arden Plymouth indicated to the following persons: No. of shares
Percent of
Purchaser
purchased
ownership
Boyd W. Lemmon
62.2
20
George Fait
31.1
10
Helen Ibbetson
62.2
20
Jay F. Walker
62.2
20
The purchase and sale of such shares was made at Fait's cost and subject to Fait's agreement with Prestel. Walker paid $3,433.76 for the 62.2 shares of Arden Plymouth stock he purchased. On November 22, 1963, Fait made a gift of 31.1 shares (or 10 percent of the outstanding stock) of Arden Plymouth for the benefit of each of his three children, C. Macara Fait, Barrett Fait, and Kenneth Fait. Such gifts (which in the aggregate amounted to 93.3 shares of 30 percent of the outstanding stock of Arden Plymouth) were made to a custodian under *42 the California Uniform Gift to Minors Act. As a condition to his sale of shares of Arden Plymouth stock to Walker and the other purchasers of Arden Plymouth stock, Fait required that each purchaser agree to Fait's having an option to repurchase the stock sold to him at the book value of the stock as set forth in the Stock Purchase Option and Shareholders Agreement and that each purchaser so indicate by placing his initials next to such a provision in the agreement as well as by signing the agreement. As a further condition to selling shares of Arden Plymouth to Walker and the other purchasers of such shares, Fait required that each purchaser execute a "Declaration of Trust Assignment and Voting Trust Agreement." Fait's Trust Agreement with Walker provided in part as follows: 4. That during all of said period of twenty-one (21) years from the date hereof, the TRUSTEE, or a proxy appointed by him, shall possess and be entitled to exercise the right to vote all of said 62.2 shares at all regular and special meetings of the shareholders of said corporation, and may vote for, do, or assent, or consent to any act or proceeding which the shareholders of said corporation might or could *43 vote for, do, or assent, or consent to, and shall have all the rights, powers and privileges of a shareholder or shareholders of said corporation, including, but not limited to, TRUSTEE's right to vote for any mergers, a dissolution, a sale of any or all of the assets, a sale of any or all of the Undersigned's capital stock voting trust certificates involved in and subject to the terms and conditions of this within agreement, a resignation or acceptance of any franchise or franchises. * * * 6. The right of UNDERSIGNED to sell his shares shall be controlled by the Articles of Incorporation of ARDEN PLYMOUTH, INC. and that certain Stock Purchase Option and Shareholder's Agreement given to Paul J. Prestel by Newell E. Fait dated November 22, 1963. It is further agreed, acknowledged, and completely understood by UNDERSIGNED that at the time UNDERSIGNED originally acquired an ownership interest through the purchase or receipt of a gift of UNDERSIGNED'S 62.2 shares of the common capital stock in ARDEN PLYMOUTH, INC., that said 62.2 shares acquired subject to the following conditions: A. On the face of each and every stock certificate of Arden Plymouth, Inc. originally acquired by UNDERSIGNED, *44 there is to be the following inscription typed on the face of each stock certificate - "The sale or transfer of this stock is subject to the terms of a certain Stock Purchase Option and Shareholder agreement dated November 22, 1963, between Newell E. Fait and Paul J. Prestel." and that as a result of this condition (the above inscription typed on the face of each of the stock certificates), the 62.2 shares of ARDEN PLYMOUTH, INC. belonging to the UNDERSIGNED are willingly being placed into this Voting Trust subject to exactly the same identical terms and conditions as outlined in that certain Stock Purchase Option and Shareholder Agreement dated November 22, 1963, between Newell E. Fait and Paul J. Prestel. Furthermore, UNDERSIGNED herewith acknowledges 1112 that he or she has a copy of the above mentioned Stock Purchase Option and Shareholder Agreement dated November 22, 1963, and has thoroughly and completely read and understood same, and is also in complete agreement with its requirements, terms, and conditions and therefore agrees to abide by said Agreement at all times. All purchasers of Arden Plymouth stock and the recipients of Fait's gifts of such stock executed voting *45 trust agreements similar to that executed by Walker so that all of the shares in Arden Plymouth were held by Fait as Voting Trustee pursuant to a "Declaration of Trust, Assignment and Voting Trust Agreement." A Voting Trust Certificate for 62.2 shares of Arden Plymouth was issued by Fait to Walker on November 22, 1963. On November 19, 1963, Fait, Walker, and Boyd W. Lemmon (hereinafter referred to as Lemmon) were elected as the directors of Arden Plymouth and the following were elected as officers: Newell E. Fait
President
Jay F. Walker
Vice President
Paul J. Prestel
Vice President
Boyd W. Lemmon
Secretary-Treasurer
James Lee
Assistant-Treasurer James Lee is an accountant who has done work for Fait for a number of years. On December 18, 1963, a meeting of the directors of Arden Plymouth was held, at which all of the directors, Fait, Walker, and Lemmon were present. The directors adopted a resolution that Arden Plymouth elect to be taxed as a small business corporation under subchapter "S". Arden Plymouth filed its tax return on a calendar year basis. On January 17, 1964, Arden Plymouth filed an Election by Small Business Corporation, Form 2553, with the *46 district director of internal revenue, Los Angeles, California, in which it elected to be taxed as a partnership under the provisions of section 1372. Accompanying that form were consents to the election executed by all of the then shareholders of Arden Plymouth, including Walker and his wife. In 1963 Fait was contacted by Chrysler Motors Corporation concerning the acquisition of a Dodge automobile dealership in Canoga Park, California. While Fait originally intended to acquire the dealership, himself, he offered it to Walker, subject to the approval of Chrysler Motors Corporation. Walker was granted the dealership for the sale of Dodge automobiles in Canoga Park, California (hereinafter referred to as Walker Dodge). In January 1964, Walker began setting up the dealership in Canoga Park. In order to raise the capital which he needed to finance the dealership Walker offered his stock in other Fait-owned corporations for retirement, and his stock in those corporations was retired. Fait acquired no interest in Walker Dodge as either an equity holder or creditor. Walker remained on the payroll of one Fait-controlled corporation. Seven-Up Bottling Co. of Pittsburgh, until March 1964. *47 Between January and March of 1964, Walker's efforts were primarily directed at setting up Walker Dodge. During that time time Walker did not perform any substantial services for Arden Plymouth. During the first 9 months of 1964 Arden Plymouth earned an amount in excess of $164,000. By early October 1964, Fait had decided to repurchase Walker's stock in Arden Plymouth which was the only Fait enterprise with which Walker was still associated. On October 22, 1964, Lemmon contacted Walker by telephone and informed him that a special meeting of the directors of Arden Plymouth was being called for the following day, October 23, 1964. Walker informed Lemmon that he could not be present on October 23 but that he could arrange to be at a meeting on October 24, 1964. On October 22, 1964, a Western Union telegram was sent to Walker giving notice of a special meeting of the board of directors of Arden Plymouth to be held on October 23, 1964, in Orange, California. On October 23, 1964, a meeting of the board of directors of Arden Plymouth was held. Fait and Lemmon, president and secretary, respectively, were present. The meeting was adjourned until 11 a.m. on October 24, 1964, in order *48 to allow Walker to be present. On October 24, 1964, a special meeting of the board of directors of Arden Plymouth was held. All directors, Fait, Walker, and Lemmon were in attendance. The minutes of the meeting are as follows: The regular continued special meeting of the Board of Directors of this Corporation was held at 11:00 A.M., Pacific 1113 Daylight Time on the 24th day of October 1964, at 405 Union Bank Square, Orange, California, with all of the directors present. The meeting was called to order by the President, Mr. Newell E. Fait and the Secretary of the Corporation, Boyd W. Lemmon, acted as Secretary for this meeting. A discussion was then held as to the monies to be distributed under the provisions of sub-chapter S with regard to the earnings or net profit from operations for the nine month period from January 1, 1964 through September 30, 1964. The Secretary of the Corporation indicated that according to the financial statement of the corporation that a sum of $164,465.28 is available for distribution to the stockholders. Mr. Jay Walker inquired as to the capital loan now outstanding and he was informed by the Secretary that the capital loan payable to the *49 Bank of America, NT&SA is presently in the amount of $125,000.00. Mr. Walker then stated that if the total net earnings were distributed at the present time it would appear to him that the corporation would be extremely short of cash and he wondered how this situation would be remedied. Mr. Fait, the President of the Corporation, stated that undoubtedly most of the stockholders would leave their distribution or at least a major portion of it in the corporation as stockholders' loans. Mr. Fait further stated that by declaring such distribution this would enable some of the stockholders to at least have some of the cash available for their personal use and in any event he would see to it that any financing problems would be personally taken care of by him. It was agreed that if there should be an imperfection in the sub-chapter S status of the corporation that the sums so distributed shall be considered as loans to the stockholders in the amout they actually received. Upon motion duly made, seconded and unanimously carried, the following resolution was adopted: RESOLVED: To distribute on November 10, 1964, to all stockholders of record as of September 30, 1964, all earnings or net *50 profit from operations for the nine month period from January 1, 1964 through September 30, 1964, which sum will be $164,465.28. FURTHER RESOLVED: That in the event that at some subsequent date for reasons presently unknown there might be an imperfection presently existing in the sub-chapter S election (Revenue Code 1372(a)) of a serious enough consequence as to void the subchapter S election, then in that event the distribution above approved be considered as personal interest bearing demand loans to stockholders rather than dividend of any type to any of the stockholders. There being no further business to come before the meeting and upon motion duly made, seconded and unanimously carried, the meeting was adjourned. Immediately following some discussion of a dividend at the meeting at Union Bank Square in Orange, California on October 24, 1964, Fait handed a letter to Walker, notifying Walker that Fait was exercising his right to purchase Walker's stock in Arden Plymouth. Accompanying the letter was a cashier's check dated October 23, 1964, in the amount of $11,156.82. Although Fait had discussed with Lemmon and his attorneys his intent to exercise his option to purchase Walker's *51 stock in Arden Plymouth, he had not mentioned his intent to Walker, and Walker's first knowledge of Fait's intent to exercise his option to purchase the stock was when he read the letter Fait handed him on October 24, 1964. On or about November 10, 1964, a letter was sent by Arden Plymouth to Walker referring to the distribution of earnings authorized by the directors on October 24, 1964. The letter was accompanied by a check in the amount of $32,893.06 payable to Walker which the letter stated represented his share of the distribution of corporate earnings. Fait's brother, George Fait, also received a cash distribution from Arden Plymouth on November 10, 1964, but the other shareholders received no cash distribution. Arden Plymouth treated the pro rata share of the September 30, 1964 earnings and profits of Arden Plymouth of its other shareholders as loans by these shareholders to the corporation. On their original Federal income tax return for the calendar year 1964, Walker and his wife reported the payment to Walker from Arden Plymouth in the sum of $32,893.06 as ordinary income. In addition, Walker and his wife reported a longterm capital gain in the amount of $7,723.06, representing *52 the difference between his basis in his 62.2 shares of Arden Plymouth stock and the sum of $11,156.82 received from Fait for that stock. That return was prepared for the Walkers by James Lee. On May 19, 1966, the Walkers filed a claim for refund in the form of an amended return for the calendar year 1964, claiming that the $32,893.06 distributed to them by Arden Plymouth was a portion of the sales price of the 62.2 shares of Arden 1114 Plymouth common stock purchased by Fait on or about October 24, 1964. On the amended return the Walkers showed as total sales price of the Arden Plymouth stock $44,049.88 and a long-term capital gain of $40,616.12. The claim for refund and amended returns were examined by respondent's revenue agent. Respondent approved the claim for refund and issued a refund check to the Walkers in the full amount they claimed. In his notice of deficiency respondent explained his adjustment of the Walkers' income in connection with the sale of the Arden Plymouth stock as follows: In the prior determination for the taxable year 1964 a gain of $40,616.12 from the sale of Arden Plymouth, Inc. shares was considered to be a long-term capital gain. It is now determined *53 that $32,893.06 of that amount constituted a distribution of earnings from Arden Plymouth, Inc., taxable as ordinary income, and the balance of $7,723.06 was a longterm capital gain as originally reported. Therefore Ordinary income is increased by $32,893.06 and capital gain is adjusted as shown in adjustment (c), below. The Faits on their 1964 Federal income tax return did not include in their distributions from Arden Plymouth any part of the $32,893.06 paid to Walker on November 10, 1964. Respondent in his notice of deficiency to the Faits increased their reported income by this amount designating the amount as "Corporation (Sub-chapter S) distribution" and in explanation stated that the Faits' "actual and constructive distributions" from Arden Plymouth were $52,914.33 rather than the $20,021.27 they reported. Opinion Fait takes the position that the distribution of the $32,893.06 to Walker by Arden Plymouth was the distribution of a dividend declared while Walker was the beneficial owner of the Arden Plymouth stock, and that the amount was taxable to Walker as ordinary income. Walker contends that this distribution constituted a part of the purchase price of his 62.2 shares *54 of Arden Plymouth stock, thereby becoming a part of his capital gain on his sale of that stock and constituting a constructive dividend to Fait. Obviously, the positions taken by Fait and Walker are antithetical. Respondent states that he is a stakeholder, simply seeking consistent tax treatment of the parties. However, in his brief respondent lends his support to the position of Fait and states that his principal position is that the dividend income was received by Walker. The issue here present is not new. The fact that either Walker or Fait received a dividend from Arden Plymouth is undisputed. The question is which of them received the dividend. Fait relies on cases such as T.K. Coffey, Jr., 14 T.C. 1410 (1950); Merrill C. Gilmore, 25 T.C. 1321 (1956); and Sam E. Wilson, Jr., 27 T.C. 976 (1957), affirmed per curiam 255 F. 2d 702 (C.A. 5, 1958), in which we held that the seller of stock was the beneficial owner of the stock at the time the dividend was declared and thus was the recipient of the dividend. We have, of course, in other *55 cases such as William B. Aull, Jr., et al., Executors, 26 B.T.A. 862 (1932); Estate of Arthur L. Hobson, 17 T.C. 854 (1951); and Frithiof T. Christensen, 33 T.C. 500 (1959), held that when, at the time the dividend was declared the buyer was the beneficial owner of the stock, the buyer was the constructive recipient of the dividend even though the dividend was paid to the seller. We consider the payment to the seller in those cases to be as a part of the purchase price of the stock. In Alfred N. Hoffman, 47 T.C. 218, 233 (1966), affirmed per curiam 391 F. 2d 930 (C.A. 5, 1968), we summarized our holding in some of these cases as follows: The present situation has its counterpart in cases raising the question who, as between seller and buyer, is subject to tax on dividends declared on stock which has been the subject of a contract of sale but which has been pledged with seller pending payment of the purchase price. The result appears to be firmly established that the buyer is the true owner of the stock, regardless of who *56 has technical legal title, and that it is the buyer rather than the seller who must account for the dividends notwithstanding that they may in fact have been paid to the seller to be applied against the purchase price. Moore v. Commissioner, 124 F. 2d 991 (C.A. 7); Estate of Arthur L. Hobson, 17 T.C. 854, acq. 1952-1 C.B. 2; Rev. Rul. 56-153, 1956-1 C.B. 166, Cf. Levy v. United States, 67 F. Supp. 958 (Ct. Cl.); Northern Trust Co. v. United States, 193 F. 2d 127 (C.A. 7); Alvin B. Lowe, 44 T.C. 363. 1115 See also Mayer v. Donnelly, 247 F. 2d 322, 326 (C.A. 5). * * * Walker takes the position that the distinction in the two lines of cases is no longer valid since the Fifth Circuit in Casner v. Commissioner, 450 F. 2d 379 (C.A. 5, 1971), affirming in part and reversing in part a Memorandum Opinion of this Court, [2] relying on Steel Improvement and Forge Company v. Commissioner, 314 F. 2d 96 (C.A. 6, 1963), reversing 36 T.C. 265 (1961), and Waterman Steamship Corporation v. Commissioner, 430 F. 2d 1185 (C.A. 5, *57 1970), reversing 50 T.C. 650 (1968), reversed our holding that a dividend, declared prior to the date of sale of the shares of two shareholders, was taxable to the sellers and not to the purchasers. The basis of the Fifth Circuit's decision in the Casner case was that the transaction there involved was a dividend declared for the benefit of the purchasers of the stock which was therefore taxable to the purchasers. Since appeal in the instant case lies to the Ninth Circuit and not to the Fifth Circuit, it is not incumbent upon us to follow the view of the Appeals Court in the Casner case, even if that case were on all fours with the instant case. However, since in our view, the instant case is factually distinguishable from the Casner case, as well as from the Steel Improvement Forge Co. and Waterman Steamship Corp. cases, relied on by the Fifth Circuit in the Casner case, we need not in this case decide whether we will accept the holding of the Fifth Circuit in Casner, or adhere to our position in that case. In Casner, as in prior cases, we held that whether a dividend declared in connection with a sale of stock is taxable to the seller or buyer depends on which party *58 is the beneficial owner of the stock when the dividend is declared.
The facts in the instant case differ substantially from those in the Casner case in the same way they differ from the facts in the cases relied on by Fait in which we held a dividend to be taxable to the seller of stock because the dividend was declared while the seller was the beneficial owner of the stock. All of those cases involved a freely negotiated sale and purchase of stock between parties free to negotiate the method and terms of the sale. In those cases the seller and purchaser agreed between themselves in connection with the negotiation of the sale that the corporation would declare a dividend before the contract for sale was entered into. In the instant case Fait required as a condition to the original transfer of the beneficial interest in the 62.2 shares of stock to Walker that Walker agree that Fait have an option to repurchase the stock at a price to be computed in a prescribed manner. There was no negotiation of a sale between Fait and Walker when Fait exercised his option to purchase Walker's stock. In fact, Walker was not aware that *59 Fait intended to exercise the option until he was handed a letter and check by Fait. Under the contract entered into when Walker purchased his stock from Fait, the earnings and profits of the corporation were to be part of the book value of the stock used to fix the price of the stock. The agreement, however, provided that if the corporation had elected to be taxed under subchapter S, the earnings and profits would be considered to be owed to the shareholders upon Fait's exercise of his option to purchase the stock. Since Arden Plymouth had elected to be taxed under subchapter S when Fait exercised his option to repurchase Walker's stock, the earnings and profits of the corporation as of the end of the month preceding the exercise would have become a current liability of the corporation to the shareholders had no dividend been declared. When this agreement was entered into, Fait was the owner of not only the legal title but also all rights in the Arden Plymouth stock and the execution of the agreement by Walker was made a condition to his purchase of a beneficial interest in Arden Plymouth's stock. Fait retained legal title and a right to vote the stock as a further condition to *60 the sale. Fait prescribed that his repurchase of the stock would be at book value less earnings and profits of the corporation if the corporation elected to be taxed under subchapter S. The earnings and profits were to be treated as owed to the shareholders if election under subchapter S had been made. In view of this agreement, the actual declaration of a dividend by Arden Plymouth on October 24, 1964, was a meaningless act insofar as it affects the price Fait would be required to pay for Walker's stock or the amount Walker would receive for that stock. The obligation of Arden Plymouth to Walker for his pro rata share of the earnings and profits would have a value equivalent to the dividend he received. 1116 The facts of this case clearly distinguish it from the facts in the cases in which we have held a dividend to be taxable to a seller of stock if it was declared while the seller of stock was still the owner of such stock and prior to the execution of the contract for sale of such stock. The facts here are not completely comparable to the facts in those cases where we have held a dividend taxable to the purchaser because it was declared after a contract to sell the stock *61 had been entered into with the seller retaining title until the purchase price or an agreed portion thereof had been paid with the dividends declared after the contract was entered into being considered as payment on the price of the stock. However, the facts here are much more comparable to the facts in this latter group of cases. The contract for sale in this case was not entered into in October 1964 when Fait exercised his option but in 1963 when Walker purchased the stock on the conditions required by Fait. In our view this agreement between Fait and Walker when Fait owned all the stock of Arden Plymouth made as a condition to his sale of part of that stock to Walker was in effect an agreement that if Fait exercised his option to repurchase the stock and Arden Plymouth had elected to be taxed under subchapter S, a part of the purchase price of the stock would be the obligation of Arden Plymouth to the stockholders from whomFait was purchasing stock for the amount of the earnings and profits of the corporation as of the close of the preceding month. Therefore, there is no substantive distinction in this case and other cases holding a purchaser to have received a dividend from a *62 corporation when he uses funds of the corporation to pay part of his purchase price of the stock. See Frithiof T. Christensen, supra.
The facts here show that the dividend was declared by Arden Plymouth after Fait had decided to exercise his option and had determined the price he would pay for the stock by excluding from the book value of the stock the dividend he planned for Arden Plymouth to declare. Since Fait already had a contract granting him the option to repurchase Walker's stock and was capable under any circumstances of having Arden Plymouth declare a dividend, because he had an absolute right to vote all the Arden Plymouth stock and could elect a new board of directors if the present board would not do his bidding, the dividend here was in a realistic sense declared after the "contract" for the purchase by Fait of Walker's Arden Plymouth stock had been entered into. Therefore, this case fits more nearly into the pattern of those cases in which we have held a dividend declared after a contract for sale of stock had been entered into to be taxable to the buyer and to be a part of the purchase price paid to the seller. We therefore hold on the basis of the *63 facts in this record that the $32,893.06 paid to Walker on November 10, 1964, by check of Arden Plymouth was a part of the sale price of Walker's Arden Plymouth stock and constituted a dividend to Fait. We reach this conclusion based on the rationale of our cases holding a dividend declared after a contract for sale of stock has been entered into to be a part of the purchase price of the stock and without reaching the question of whether this conclusion would be required by the holding of the Fifth Circuit in Casner v. Commissioner, supra, or whether we would follow or respectifully decline to follow the holding of the Fifth Circuit in that case. Decisions will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. J. E. Casner, Jr., T.C. Memo. 1969-98↩.