T.C. Memo. 2010-245


UNITED STATES TAX COURT


FLEXTRONICS AMERICA, LLC, AS ALTERNATIVE AGENT PURSUANT TO TREAS.
REG. § 1.1502-77A(e)(4)(ii) FOR C-MAC HOLDINGS, INC., &
SUBSIDIARIES CONSOLIDATED GROUP, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9543-07.                    Filed November 8, 2010.


    William A. Schmalzl, Joel V. Williamson, Jongjit

Wongsrikasem, Jeffrey A. Goldman, C. Cabell Chinnis, Jr., Matthew

C. Houchens, and Erin G. Gladney, for petitioner.

    James P. Thurston, Bryce A. Kranzthor, Cameron M. McKesson,

Rachel L. Hester, Christopher B. Sterner, Barbara M. Leonard, and

Mary E. Wynne, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  After concessions, the issue for decision is whether transactions relating to inventory should be disregarded and the step-up in basis relating to such assets disallowed.

FINDINGS OF FACT

Petitioner, Flextronics America, LLC, is a Delaware limited liability company with its principal place of business in Milpitas, California.  Petitioner is the agent for C-MAC Holdings, Inc. (C-MAC Holdings), & Subsidiaries Consolidated Group (collectively, C-MAC).  In 1998 C-MAC was wholly owned by C-MAC Industries, Inc. (Canadian Parent),[1] a Canadian company and parent company of all C-MAC entities.  Canadian Parent and all its direct and indirect subsidiaries are hereafter referred to as C-MAC Worldwide Group (C-MACW).

C-MACW, a leading international manufacturer of electronic components, owned and operated manufacturing plants.  During the years in issue, Northern Telecom, Inc. (Nortel) was one of the largest purchasers of C-MACW's products.  Nortel manufactured telecommunications networking and switching equipment that routed wireless telephone calls.  This equipment was housed in large metal boxes which were fabricated in Nortel's mechanical and test facility in Creedmoor, North Carolina (Creedmoor).  Each box

---

[1]Canadian Parent was acquired by Solectron Corp. in December 2001.  In October 2007, Solectron was acquired by petitioner.

contained a circuit board which provided power and connectivity for networking and switching equipment. C-MACW manufactured the circuit boards and other component parts and supplied them to Nortel.

I. <u>The Creedmoor Sale</u>

In late 1997, Nortel determined that because it was not operating Creedmoor at full capacity it would be more cost effective to sell Creedmoor and enter into a long-term supply agreement with Creedmoor's purchaser. Nortel solicited, and in March 1998 C-MACW and at least three other electronic components suppliers submitted, bids to purchase Creedmoor. C-MACW's $60 million offer was the winning bid. The acquisition was an integral part of C-MACW's plan to become a full-service provider of telecommunications equipment. Purchasing Creedmoor was also important to C-MACW because sales to Creedmoor had typically accounted for 50 percent of C-MACW's U.S. revenues and more than 15 percent of its worldwide revenues. On May 6, 1998, Nortel faxed proposed asset purchase and supply agreements to Canadian Parent.[2] On May 13, 1998, Canadian Parent, in response to Nortel's proposals, submitted its terms for the asset purchase and supply agreements.

---

[2]C-MACW chose Canadian Parent to execute the agreement because Nortel required that the executing entity of the asset purchase agreement have resources sufficient to ensure performance obligations.

II.  The Asset Purchase Agreement

After Canadian Parent submitted its bid and offer to purchase Creedmoor, C-MACW contacted KPMG, its accountant.  KPMG, in May 1998, advised C-MACW of possible tax planning options relating to the Creedmoor acquisition.  Those options included a proposed advance purchase of Creedmoor's inventory assets (the plan).  KPMG advised C-MACW's senior management that successful execution of the plan would require a business purpose and would allow petitioner to deduct a significant loss relating to the Creedmoor purchase.  Pursuant to the plan C-MAC, on May 28, 1998, would enter into an agreement with Nortel to purchase Creedmoor's inventory.  Ten to fifteen days later, Nortel and C-MAC Interconnect Products, Inc. (C-MAC Interconnect), one of Canadian Parent's Canadian subsidiaries, would enter into an agreement to transfer, before closing, ownership of the inventory from Nortel to C-MAC Interconnect, with the remaining assets to be transferred at a later date.  Once C-MAC Interconnect acquired the inventory, C-MAC Interconnect would pledge the inventory as security to C-MACW's lenders.  Pursuant to the plan, C-MAC Holdings would incorporate a new U.S. corporation, C-MAC Network Systems, to acquire the remaining Creedmoor assets.  KPMG referred to the inventory as "Bump Assets" because the series of

transactions was designed to trigger sections 357(c)[3] and 362(a) and thereby increase, or "bump up", the inventory's basis to equal the total amount of liabilities secured by the inventory.[4]

Through numerous years of acquiring manufacturing facilities, Dennis Wood, the chief executive officer of C-MACW, expanded C-MACW from a small Canadian company into a large international corporation. During a meeting with senior management regarding the acquisition of Creedmoor, Mr. Wood was informed about the plan and its accompanying tax considerations. Mr. Wood agreed to the plan because he believed that C-MACW could use the inventory in several of its worldwide facilities and that the plan would not hinder C-MACW's ultimate objective--to purchase Creedmoor.

On May 28, 1998, Canadian Parent and Nortel executed the Asset Purchase Agreement (APA). Pursuant to the APA, the purchase price (i.e., which included inventory assets with a December 31, 1997, estimated book value of $17.94 million) would

---

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[4]Sec. 357(c) provides that, in the case of an exchange to which sec. 351 applies, if the sum of the liabilities assumed plus the amount of the liabilities to which the property is subject exceeds the total adjusted basis of the property transferred, then such excess shall be recognized as gain to the transferor. Sec. 362(a) provides that the transferee's basis in property transferred in connection with a sec. 351 transaction shall be equal to the transferor's basis plus any gain recognized to the transferor on the transfer.

be adjusted in accordance with the physical inventory on the closing date.  On June 22, 1998, Canadian Parent sent a letter to Nortel proposing to purchase the inventory before the APA closing date.  Nortel ultimately agreed.

III.  The Inventory Purchase

From July 1 through 10, 1998, C-MACW entered into several transactions involving the inventory (the inventory transactions).  On July 1, 1998, Nortel, Canadian Parent, and C-MAC Interconnect executed the First Amendment to Asset Purchase Agreement (amendment to APA).  Pursuant to the amendment to APA, C-MAC Interconnect was authorized to purchase Creedmoor's inventory.  C-MAC Interconnect and Nortel, on July 1, 1998, also executed a bailment agreement.  The bailment agreement provided that the inventory was to be kept, maintained, and used by Nortel at Creedmoor pending the closing.  The bailment agreement also provided that C-MAC Interconnect and its affiliates had the authority to pledge and encumber the inventory and transfer rights to, title to, and interest in the inventory.  Canadian Parent, which bore the risk of loss during the bailment period, was obligated to insure the inventory.  On July 2, 1998, C-MAC Interconnect paid Nortel $12.1 million (i.e., cash from C-MAC Interconnect and a loan from Caisse de Dépôt et Placement du Québec, a Canadian lender) for the inventory.  On the same date, Nortel executed a bill of sale and assignment providing for the

sale of its rights to, title to, and interest in the inventory to C-MAC Interconnect. During the bailment period, Nortel continued to operate Creedmoor, acquire new inventory, and ship finished products. The parties agreed Nortel would purchase from C-MAC Interconnect any inventory Nortel used during the bailment period. Nortel used computerized systems to manage and track the inventory.

On July 2, 1998, Canadian Parent determined that C-MAC Quartz Crystals, Ltd. (C-MAC Quartz), a member of C-MACW that owned and operated a manufacturing facility in Harlow, Essex, England, needed $280,000 in inventory. The bill of sale and purchase order for the inventory were completed on July 7, 1998, and the request for shipment of the inventory was completed on July 8, 1998 (collectively, the Quartz sale). The inventory that C-MAC Quartz purchased was transferred to Nortel's Alston Avenue facility in Durham, North Carolina.

IV. The Acquisition Financing

C-MACW financed the Creedmoor acquisition through existing credit arrangements with Caisse de Dépôt et Placement du Québec (Caisse Bank), the National Bank of Canada (NBC), and the Royal Bank of Canada (RBC). On July 7, 1998, C-MACW borrowed a total of $51.6 million. C-MAC Interconnect borrowed $5.4 million from Caisse Bank. C-MAC General Partnership, a Canadian Parent affiliate, borrowed $29.6 million from Caisse Bank and a total of

$16.6 million from the New York branches of NBC (NBC New York) and RBC (RBC New York).

On July 7, 1998, C-MAC Interconnect also entered into a security agreement with Caisse Bank, NBC New York, RBC New York, and General Trust of Canada and pledged the inventory as security for payment of the $51.6 million in liabilities. The security agreement, which stated that C-MAC Interconnect owned the inventory free and clear, gave the lenders a continuing, first-priority interest in all of C-MAC Interconnect's rights in the inventory. On July 8, 1998, the lenders filed their security agreement with the register of deeds for the county in which Creedmoor was located.

V. The Inventory Transfers and Purchase of Remaining Assets

On July 10, 1998, the inventory, which was subject to the $51.6 million in liabilities, was transferred to two different C-MAC entities. First, C-MAC Interconnect transferred the inventory to C-MAC Holdings[5] in exchange for 10,107 shares of C-MAC Holdings stock and a $9.5 million promissory note, and Canadian Parent transferred $4 million to C-MAC Holdings in exchange for 17,124 shares of C-MAC Holdings stock (Holdings' capitalization). After Holdings' capitalization, Canadian Parent and C-MAC Interconnect owned 62.65 and 34.37 percent,

---

[5]At that time there was $11.8 million in inventory (i.e., the original $12.1 million less the $280,000 that had been sold to C-MAC Quartz).

respectively, of C-MAC Holdings' outstanding stock.  Second, C-MAC Holdings transferred the inventory and $2.3 million to C-MAC Network Systems, Inc., a newly formed U.S. subsidiary, in exchange for 10,107 shares of C-MAC Network Systems stock and a $9.5 million promissory note (Network Systems' capitalization). Canadian Parent formed C-MAC Network Systems because Canadian Parent wanted Creedmoor to be operated by an entity that, for Federal income tax purposes, was part of C-MAC's consolidated group.  After its capitalization, C-MAC Network Systems had cash and assets and C-MAC Holdings owned 100 percent of C-MAC Network System's outstanding stock.

On July 24, 1998, C-MAC General Partnership lent C-MAC Network Systems $42.2 million, which C-MAC Network Systems used to purchase the remaining Creedmoor assets (i.e., the noninventory assets).  Nortel executed a bill of sale and assignment memorializing the transfer of its interest in the inventory.  Canadian Parent and KPMG completed a physical inventory summary and determined that, as of July 24, 1998, the inventory had a net value of $13.1 million.  Pursuant to the inventory summary, C-MAC Holdings paid Nortel an additional $1 million for the inventory (i.e., $13.1 million inventory value per inventory summary less $12.1 million paid pursuant to the amendment to APA).  By the end of 1998, C-MAC had disposed of all the inventory.

On its 1998 Federal income tax return, petitioner reported a $37.3 million loss, taking into account the $39.8 million increase to the inventory's basis.  Respondent, on January 31, 2007, issued petitioner a notice of deficiency relating to 1998, 1999, and 2000, in which respondent disallowed the claimed loss and determined deficiencies of $863,931, $6,398,534, and $14,979,322, respectively.[6]  On April 30, 2007, petitioner filed its petition with the Court seeking redetermination.

                              OPINION

With respect to the Creedmoor acquisition, we must determine whether the inventory transactions should be disregarded and the step-up in basis relating to the inventory disallowed.[7]  We conclude that the inventory transactions were valid transactions and therefore, should not be disregarded.

Section 351(a) provides that "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation."  The parties agree that the inventory transactions involving Holdings'

---

[6]The deficiencies for 1999 and 2000 resulted from the disallowance of the 1998 losses that had been carried forward to 1999 and 2000.

[7]In the absence of the inventory transfers, the statutory provisions petitioner relied on to calculate the losses, secs. 357(c) and 362(a), would not have been applicable.  See supra note 4.

capitalization and Network Systems' capitalization meet the literal requirements of section 351. Respondent, however, contends that the inventory transactions must be disregarded because they "fall outside the statutory purpose of section 351", lack section 351 business purpose, lack economic substance, and are subject to disallowance pursuant to the step transaction doctrine.

Respondent's challenge fails with respect to each contention. We are not persuaded by respondent's contentions and are not inclined to stretch inapplicable judicial doctrines to corral a transaction that escaped before Congress closed the barn door. As of October 19, 1998, 3 months after petitioner completed the inventory transactions, the barn door was effectively closed by Code amendments to ensure that with respect to the transfer of property subject to a liability, the "bump up" in basis not exceed the fair market value of the property.[8]

---

[8]Congress did not amend sec. 351, but instead amended sec. 357(c) and added secs. 357(d) and 362(d). The amendments did not mandate that transactions similar to the inventory transactions be disregarded but instead provided, in relevant part, that the "bump up" in basis with respect to such transactions could not exceed the fair market value of the property. The modifications were not technical corrections retroactive to the date of enactment of the statutes, but instead were prospective and revenue-raising amendments. See Miscellaneous Trade and Technical Corrections Act of 1999, Pub. L. 106-36, sec. 3001, 113 Stat. 181; Staff of Joint Comm. on Taxation, General Explanation of Tax Legislation Enacted in the 106th Congress, at 9-11 (J. Comm. Print 2001).

Simply put, petitioner and its inventory transactions were a step ahead of Congress and the Internal Revenue Service.

I.    The Inventory Transactions Fall Within the Scope of Section 351

Respondent, citing Wolf v. Commissioner, 357 F.2d 483 (9th Cir. 1966), affg. 43 T.C. 652 (1965), and Gregory v. Helvering, 293 U.S. 465 (1935), contends that the purported section 351 inventory transactions (i.e., Holdings' capitalization and Network Systems' capitalization) "fall outside the statutory purpose of section 351" and should be disregarded because the purpose of section 351 is the deferral of gain or loss recognition, not total avoidance.  Respondent emphasizes that C-MAC Network Systems received the tax benefit of the loss, but C-MAC Interconnect was not subject to U.S. tax and did not incur a corresponding gain.  Petitioner contends, and we agree, that the cases respondent cites are factually distinguishable.  In Wolf and Gregory, the courts considered the intent and purpose of the relevant statutes but ultimately rendered decisions based on the substance and nature of the transactions.  See Wolf v. Commissioner, supra at 484-485 (stating that "the incidence of taxation depends upon the substance of a transaction. * * * What is decisive in a case such as is before the court is what actually occurred."); Gregory v. Helvering, supra at 470 (stating that "The whole undertaking * * * was in fact an elaborate and devious form of conveyance masquerading as a corporate

reorganization"). Nevertheless, respondent relies on the court's statement in Wolf v. Commissioner, supra at 486, that "In looking to the substance of the present transaction the 'net effect' would not be a postponement of recognition of a gain on an exchange, but the escape of the tax upon a dividend * * * which is contrary to the meaning of section 351". Respondent focuses on the words "escape of the tax" and "contrary to the meaning of section 351" yet ignores the words "the substance of the present transaction" and "upon a dividend"--key elements of the court's analysis. The determining factor in Wolf was not that the transactions resulted in an avoidance of tax. See id.; Wolf v. Commissioner, 43 T.C. at 660 n.9 (quoting Gregory v. Helvering, supra at 469 ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.")). The determining factor was that several transactions lacked substance and were used to disguise the primary transaction's true nature-- a dividend. See Wolf v. Commissioner, 357 F.2d at 485. Certainly the creation and use of entities and transactions that lack substance "fall outside the statutory purpose of section 351." The inventory transactions, however, were valid substantive transactions. See infra secs. III. and IV.

II.  The Inventory Transactions Had Business Purpose

Respondent contends that the purported section 351 inventory transactions fail because they lack the requisite section 351 business purpose.  Respondent cites caselaw and administrative rulings to support his contention that there is a section 351 business purpose requirement.[9]  Neither section 351 nor any of the cited sources explicitly set forth a business purpose requirement for section 351 transactions.  Irrespective of whether there is a section 351 business purpose requirement, there were business purposes for the inventory transactions.  The inventory transactions (i.e., Holdings' capitalization and Network Systems' capitalization) provided for part of the capitalization of C-MAC Network Systems and enabled the Creedmoor business to be operated as a separate subsidiary of Canadian Parent's U.S. consolidated operating group.

Respondent emphasizes KPMG's role with respect to the inventory transactions.  Certainly Canadian Parent and KPMG contemplated different ways to bolster the appearance of a business purpose relating to the inventory transactions.  There is no doubt KPMG fervently encouraged the use of the planning technique.  Receiving KPMG's advice did not, however, nullify

---

[9]Respondent cites Gregory v. Helvering, 293 U.S. 465 (1935), Wolf v. Commissioner, 357 F.2d 483 (9th Cir. 1966), affg. 43 T.C. 652 (1965), Stewart v. Commissioner, 714 F.2d 977 (9th Cir. 1983), affg. T.C. Memo. 1982-209, Rev. Rul. 55-36, 1955-1 C.B. 340, and Rev. Proc. 83-59, sec. 4.06, 1983-2 C.B. 575, 580.

petitioner's bona fide business purposes for the transactions. KPMG was simply advising a client on different ways to minimize the tax consequences of a proposed transaction--precisely what tax accountants are paid to do. The inventory transactions were valid section 351 transactions.

III. The Inventory Transactions Had Economic Substance

Respondent contends that the inventory transactions should be disregarded because they lack economic substance. "Although the taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984) (emphasis added), affg. 79 T.C. 714 (1982) (citing Stewart v. Commissioner, 714 F.2d 977, 987 (9th Cir. 1983), affg. T.C. Memo. 1982-209). The standard in determining whether a transaction has economic substance (i.e., is not a sham) is whether the transaction has any practical economic effects other than the creation of income tax losses (i.e., whether the taxpayer has shown that there was a nontax business purpose for engaging in the transaction and whether the taxpayer has shown that the transaction had economic substance beyond the creation of tax benefits). See Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985); Bail Bonds by Marvin Nelson,

Inc. v. Commissioner, 820 F.2d 1543, 1548-1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23. The inventory transactions, which were not entered into for the sole purpose of evading taxes, had economic substance and were legally valid transactions that did what they purported to do. C-MAC Interconnect purchased the inventory from Nortel; sold part of the inventory to C-MAC Quartz, which needed the inventory for its business; pledged the inventory as security for the bank loans needed to purchase Creedmoor; and transferred the remaining inventory to C-MAC Holdings. The lenders perfected the security lien by filing the security agreement with the register of deeds in the county in which the inventory was located. C-MAC Holdings capitalized C-MAC Network Systems by contributing the inventory and other assets to C-MAC Network Systems. In addition, the inventory was legally transferred and subject to a valid lien.

Respondent contends that C-MAC Interconnect's purchase of the inventory from Nortel was, in substance, an advance deposit on the inventory that was acquired at closing. Respondent further contends that C-MAC Interconnect had no right to possession or control of the inventory and did not benefit from the inventory until after the closing. To the contrary, upon purchase of the inventory and execution of the bailment agreement, C-MACW had the right to pledge and encumber the inventory and transfer rights to, title to, and interest in the

inventory. Not only did C-MACW have rights to the inventory, but it also benefited from the inventory purchase. As previously mentioned, C-MAC Interconnect sold some of the inventory (i.e., to C-MAC Quartz) and made it available for use in its other operations. The advance inventory purchase had economic substance.

Respondent contends that the Quartz sale was contrived. In support of his contention, respondent emphasizes that the inventory purchased by C-MAC Quartz was transferred to Nortel's Durham, North Carolina, facility and not C-MAC Quartz's facility in England. Regardless of where C-MAC Quartz chose to store the inventory after purchase, C-MAC Quartz purchased the inventory and Mr. Wood established that it was important to make the inventory available for use in other parts of its business. Further, it does not matter what C-MAC Quartz actually did with the inventory. What matters is petitioner's intent. Mr. Wood credibly testified that petitioner intended to use the inventory in other operations. Respondent further contends that the Quartz sale was invalid because C-MAC Interconnect "had no right to possession or control of the inventory during the bailment period." As previously stated, the bailment agreement gave C-MAC Interconnect the right to pledge and encumber the inventory and transfer rights to, title to, and interest in the inventory. In sum, the inventory transactions should not be disregarded.

IV.  The Step Transaction Doctrine Is Not Applicable

Respondent, citing Jacobs v. Commissioner, 224 F.2d 412 (9th Cir. 1955) (holding that purported stock sale transactions should be collapsed because the taxpayer's corporation was merely a conduit through which the taxpayer effectuated a sale of his land), affg. 21 T.C. 165 (1953), contends that C-MAC Interconnect and C-MAC Holdings were mere conduits for C-MAC Network's purchase of the inventory and that "The transfers * * * were without economic effect:  neither Interconnect nor Holdings conducted any business with the inventory and their ownership of the inventory was transitory at best."  To the contrary, C-MAC Interconnect and C-MAC Holdings were bona fide entities that used the inventory in their businesses.  As previously stated, C-MAC Interconnect sold part of the inventory it acquired from Nortel to C-MAC Quartz for use in C-MAC Quartz's business and C-MAC Holdings, which helped finance and set up the operating structure of C-MAC Network Systems, used the inventory to capitalize C-MAC Network Systems.  Further, the inventory transactions allowed C-MACW to create a separate U.S. subsidiary to operate Creedmoor and for that subsidiary to obtain the necessary capital (i.e., the funds to purchase Creedmoor).  The step transaction doctrine is not applicable.

In conclusion, the inventory transactions were valid transactions, and we reject respondent's determination.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.